Margaret A. SPRIGGS, Individually and as Representative of the Estate of Frank Spriggs, deceased, Emmet Spriggs, and Nora Spriggs, Plaintiffs,

v.

Kenneth R. SIRINEK, M.D., and the United States of America Defendants.

No. Civ.ASA03–CA–0922–XR.

United States District Court, W.D. Texas, San Antonio Division.

Dec. 7, 2004.

Jeffrey Clarke Anderson, Law Offices of Jeffrey C. Anderson, San Antonio, TX, for Plaintiffs.

Laura Anne Cavaretta, Plunkett & Gibson, Inc. Renaissance Plaza, Kenneth R. Sirinek, M.D., Russell & Hollan, P.C., James F. Gilligan, Raymond A. Nowak, U.S. Attorney's Office, San Antonio, TX, for Defendants.

## AMENDED ORDER

RODRIGUEZ, District Judge.

Due to a clerical error, the Court withdraws its Order dated November 22, 2004 and substitutes this Order in its place in order to clarify that Bexar County Hospital District and the University of Texas Health Science Center are two separate entities. FED R. CIV. P. 60(a); *Matter of West Texas Marketing Corp.*, 12 F.3d 497, 503–04 (5th Cir.1994).

On this date the Court considered Defendant The United States of America's

Motion for Summary Judgment (docket no. 37). The government argues that it is not liable for the alleged negligence of Dr. Gregory York, an officer in the United States Air Force working in a surgery residency program at the University of Texas Health Science Center ("UT"). The government asserts that it is immune from liability under the Texas "borrowed servant" doctrine. Plaintiffs assert that UT did not have control over Dr. York. They assert that because Dr. York's supervising physician was an independent contractor, and because the agreement between the government and UT does not expressly state that UT has control over the details of Dr. York's conduct, the government is not entitled to immunity under the borrowed servant doctrine. Because the Court finds that no genuine issue of material fact remains with respect to the government's immunity under the borrowed servant doctrine, the government's motion is GRANTED.

## I. Factual and Procedural Background

Plaintiffs' claims arise out of the death of Frank Spriggs, in May 2001. Plaintiffs allege that Dr. Gregory York failed to answer a page with respect to the post-operative condition of Spriggs, and that due to this failure Spriggs died of a preventable condition. Dr. York is an officer in the United States Air Force and was assigned to the residency program at UT. This assignment was pursuant to an agreement between the government and UT in which military doctors in the Air Force were placed in UT's residency program and under the supervision of the facility officials of UT, while maintaining their service in the Air Force, including payment benefits. Following the residency program, the military doctors then had a certain service commitment to fulfill. The

program was covered by a General Agreement and Memorandum of Understanding ("MOU") between the government and UT. The MOU provides that the agreement was for the mutual benefit of both parties; that "the trainees will be under the supervision of the facility officials of the supervising-institution [UT], and will be subject to, and be required to abide by, all of the supervising-institution's rules and regulations"; and that "the supervising-institution may generate professional bills for services rendered by trainees ... [that are] the exclusive property of the supervising-institution."[1] In Paragraph 13 of the MOU, UT agrees to make certain arrangements for the residents, including making available the facilities; arranging the schedules so as not to conflict with other programs; designating an official to coordinate the residents' clinical learning experience; providing reasonable classroom, conference, office, storage, dressing, and locker room space; provide emergency medical and dental treatment to residents while in the facility; and arrange the necessary access to the clinical facilities, including necessary parking or base permits, and access to the administrative privileges typically enjoyed by the institution's professional staff. Paragraph 14 of the MOU states that,

> While assigned to [UT] and performing services pursuant to this agreement, the military trainees remain employees of the United States performing duties within the course and scope of their federal employment. Consequently, the provisions of the Federal Tort Claims Act (Title 28, U.S.C., Sections 1346(b), 2671–2680), including its defenses and immunities, will apply to allegations of negligence or wrongful acts or omissions by the military trainee committed while

1. Paragraphs 4, 5, 7, & 8.

acting within the scope of his or her duties performed pursuant to the agreement.

Further, Paragraph 16 states that,

In the event the employer-institution is sued by a plaintiff seeking to hold it vicariously liable for negligent acts of its trainee while performing duties at the supervising-institution, the employer-institution [the government] shall make all legal defenses including the terms of this agreement to defend the claim. . . . When the supervising-institution settles or pays any claims against it involving the trainee or the other institution the supervising-institution shall obtain as broad a release as possible from the plaintiff or claimant in order to provide the employer-institution protection from further claims.

The MOU was in force and covered Dr. York's residency training.

Plaintiffs filed suit against Bexar County Hospital District[2] and Dr. Kenneth R. Sirinek, Spriggs' attending surgeon, in the 225th Judicial District of Bexar County, Texas.[3] On August 22, 2003, Plaintiffs amended their claim to add the United States of America, as the employer of Dr. York, as a defendant, pursuant to the Federal Tort Claims Act. On September 22, 2003, the United States properly removed the case to federal court, after certifying that Dr. York was acting within the scope of his employment at the time of an incident giving rise to a civil claim.[4] Bexar County Hospital District was dismissed pursuant to a joint motion on May 3, 2004. Thereafter, the government moved for summary judgment on the basis of the borrowed servant doctrine under Texas law. According to the government's motion, it is immune from suit under the borrowed servant doctrine because UT had the right to control the details of Dr. York's actions. Plaintiffs oppose summary judgment, arguing that Dr. York was acting in the course and scope of his employment for the government, that UT did not have the right to control Dr. York, and that public policy does not favor immunizing the government for Dr. York's actions.

## II. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party has the burden of showing that there is no genuine issue as to a material fact and that the moving party is entitled to judgment as a matter of law. *Willis v. Roche Biomedical Lab., Inc.*, 61 F.3d 313, 315 (5th Cir.1995). Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir.1991). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In making this determination, the court will review the evidence in the record and disregard the evidence favorable to the moving party that the jury is not required to believe.

---

**2.** Plaintiff's filed suit against "Bexar County Hospital District d/b/a University Health System."

**3.** It is unclear when this suit was filed, or who precisely the parties involved were, as Plaintiffs' Original Petition has not been provided to the Court and no reference has been made to the Original Petition.

**4.** 28 U.S.C. § 2679.

*Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 135, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). In order for a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 n. 4, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the record, viewed in this light, could not lead a rational trier of fact to find for the party opposing the motion, summary judgment is proper.

Under the Federal Tort Claims Act, questions of liability are resolved in accordance with the law of the place where the alleged negligent act or omission occurred. 28 U.S.C. § 1346(b). The alleged conduct here took place in Texas.

### III. Analysis

■ The government moves for summary judgment based on its defense of immunity under the borrowed servant doctrine of Texas law. This doctrine applies in the situation such as the present one, in which an employee of one entity is "loaned" to another entity, but maintains his employment with the first entity. *See Palmer v. Flaggman,* 93 F.3d 196, 201–02 (5th Cir.1996) (noting that the borrowed servant doctrine applies to "Texas cases involving two 'employers' "). "The common-law principles that define when there will be vicarious liability are designed to assign liability for injury to third parties to the party who was directing the details of the negligent actor's conduct when that negligence occurred." *Wingfoot Enters. v. Alvarado,* 111 S.W.3d 134, 146 (Tex.2003). The government asserts that control over

the actions of Dr. York was transferred to UT, either through the express language of the MOU, or a combination of the MOU and the circumstances of the residency program, and that therefore Dr. York was UT's borrowed servant. Plaintiffs argue that Dr. York was not UT's borrowed servant because Dr. York was acting in the course and scope of his employment for the government and UT did not have the right to control Dr. York. Plaintiffs also argue that public policy does not favor immunizing the government for Dr. York's actions.

### A. Course and Scope of Employment

■ Plaintiffs argue that the certification by the Attorney General that Dr. York was acting within the scope of his employment at the time of the incident,[5] and the provisions of the MOU, including Paragraph 14, which states that trainees in the residency program "remain employees of the United States performing duties within the course and scope of their federal employment," demonstrate that the government intended to maintain liability for the negligence of its residents while in the residency program at UT. The Fifth Circuit has addressed this argument previously and found that a military doctor could be acting in the course and scope of his military employment while still falling within the category of "borrowed servant." *Palmer,* 93 F.3d at 199. In a similar "Fellowship" residency program, the Fifth Circuit found that an Air Force doctor completing a residency in orthopedic surgery with an independent hospital was acting within the course and scope of his employment with the Air Force, even though the agreement between the government and the hospital provided that "the Fellow will be performing duties under the exclusive control and for the primary bene-

---

**5.** 28 U.S.C. § 2679.

fit of the [hospital]." *Id.* 198–99. This is because the doctor was on active duty with the Air Force and was ordered to enter the residency program. *Id.* at 199 ("By completing his residency training, Dr. Graham was accomplishing the object of his employment by obtaining the necessary training to serve as an orthopedic specialist for the Air Force at the end of his residency."). Despite the fact that the doctor in *Palmer* was acting within the course and scope of his employment with the Air Force, the Fifth Circuit found that the Air Force was not liable under the FTCA under the borrowed servant doctrine. *Id.* Because the agreement between the government and the hospital gave the hospital "full control over Dr. Graham's actions in his residency," the government was immune from liability from the actions of a doctor acting in the course and scope of his employment. *Id.*

As to the distinguishment between the "course and scope of employment" inquiry and the "borrowed servant" inquiry, *Palmer* is indistinguishable from the instant case. *Palmer* shows that these are two separate inquiries that may result in different conclusions. As to the issue of ultimate liability, it is the "borrowed servant" inquiry that has the final say under Texas law, not the "course and scope of employment" inquiry. While a finding that a military doctor was acting within the course and scope of employment may bring a claim within the Federal Tort Claims Act, the issue of liability still remains open due to the defense of borrowed servant immunity. Therefore, while the Court finds that Dr. York was acting within the course and scope of his employment with the government at the time of the incident in question, that does not impact the question of ultimate liability upon the government. That question is decided under the borrowed servant inquiry.

## B. Borrowed Servant

■ With the Texas Supreme Court's opinion in *St. Joseph's Hosp. v. Wolff*, 94 S.W.3d 513 (Tex.2002), the question of the applicability of the borrowed servant doctrine to physicians is clear. *Id.* at 542 (holding that "regardless of any evidence that [the doctor] was the general or regular employee of St. Joseph, he was acting as the borrowed employee of the Foundation as a matter of law when he treated Wolff"). The central issue as to whether a servant qualifies as a borrowed employee is whether the "borrowing" employer was "directing the details of the negligent actor's conduct when that negligence occurred." *Alvarado*, 111 S.W.3d at 146; *Wolff*, 94 S.W.3d at 542 ("[W]e conclude ... that the Foundation or its agents had the right to direct and control the details of Villafani's medical treatment of Wolff."); *see also Starnes v. U.S.*, 139 F.3d 540, 542 (5th Cir.1998) ("The right to control is the key to determining borrowed servant status."). The government asserts that UT had the right to control the details of Dr. York's treatment of Frank Spriggs. The government argues that this right of control comes directly from the language of the MOU, or alternatively, from a combination of the MOU and the circumstances of the residency program. Plaintiffs argue that the language of the MOU does not expressly grant a right to control the details of Dr. York's actions, and that the circumstances of the residency program favor finding control in the hands of the government.

■ Plaintiffs are correct that the MOU does not *expressly* grant a right to control the details of Dr. York's actions to UT. In that, this case is distinguishable from *Wolff*, *Starnes*, and *Palmer*. In each of these cases, the agreement between the "employing-institution" and the "supervis-

ing-institution" expressly state that the resident will be under the supervision and control of the supervising-institution. *Wolff,* 94 S.W.3d at 543 (noting that the contract at issue stated that the employer-institution "would 'not control the details of the medical tasks performed by the residents'"); *Starnes,* 139 F.3d at 542 (quoting the contract at issue as stating that "'the military residents while undergoing training at the training institution will be under the immediate professional supervision and control of the medical specialty teaching chief at the training institution or his/her authorized designee'"); *Palmer,* 93 F.3d at 198 ("'[A]lthough Fellow is an Air Force Officer, for the purposes of liability the Fellow is a servant of the institution. This is because the Fellow will be performing duties under the exclusive control and for the primary benefit of the institution.'"). There is nothing in the MOU that expressly states that the residents assigned to UT are under the supervision and control of UT. Nor is there any express imposition of liability upon UT, as there was in *Palmer.* However, this does not end the inquiry. An express grant of the right of control is only one factor in determining whether the supervising-institution actually obtained the right to control the details of the employee in question. *See Wolff,* 94 S.W.3d at 543 (examining the residency program requirements, the contract language, and the actions of the supervising-institution); *Dow Chem. v. Bright,* 89 S.W.3d 602, 607–11 (Tex.2002) (examining the circumstances of a general contractor-subcontractor arrangement for evidence of actual control after finding no contractual right to control).

The government argues that the purpose and effect of the MOU is to shift the right of control over direct patient care by Dr. York to UT. It notes the declaration of Dr. W. Brian Perry, the General Surgery Program Director at Lackland Air Force Base. Dr. Perry has primary oversight responsibility for the surgical resident training of Air Force physicians assigned to Lackland Air Force Base, such as Dr. York. Dr. Perry testified that when a resident is assigned to an independent hospital for a residency program, "[t]he Air Force has no input or control over the details of patient care rendered, or of medical tasks performed.... All direct patient care rendered, or medical tasks performed, by surgery resident trainees such as Dr. York is done under the supervision, direction and control of the teaching staff at the supervising-institution." In response, Plaintiffs point to the deposition of Dr. Sirinek,[6] who stated that as a resident, Dr. York was generally given direct authority to conduct treatment of patients as he saw fit, with no or minimal supervision. While neither of these testimonials are conclusive on the legal matter of whether UT had a right to control the details of Dr. York's activities, they do establish somewhat of a framework for analyzing Dr. York's residency.

The government's evidence suggests that the Air Force had no direct supervision in the details of Dr. York's residency training. Plaintiffs have offered no evidence to contradict this suggestion. Instead, Plaintiffs argue that because Dr. York was able to conduct post-operative treatment without immediate supervision, UT was not in control of his actions.

---

**6.** The Court was provided with only four pages of Dr. Sirinek's deposition, only one of which pertains to the nature of Dr. York's residency program. However, from the parties' arguments, it appears to be uncontrovert- ed that Dr. Sirinek was one of Dr. York's supervising physicians and also Spriggs's attending surgeon. As will be discussed later, Dr. Sirinek is an independent contractor physician of UT.

Plaintiffs also argue that because Dr. Sirinek, the attending surgeon to Spriggs, was an independent contractor to the hospital, insofar as Dr. Sirinek was Dr. York's supervising physician at the time of the incident in question, UT could not have a right of control over Dr. York. It is unclear from the summary judgment evidence provided whether Dr. Sirinek was Dr. York's supervising physician on the night in question. Assuming he was, as do Plaintiffs, the Court is not convinced that the independence of Dr. Sirinek or Dr. York in performing their duties affects whether UT had a *right* of control over Dr. York. While it is true that Dr. Sirinek is assumed to be an independent contractor under Texas law, and UT is therefore not liable for his negligence,[7] the fact that Dr. Sirinek was Dr. York's supervising physician does not conclusively establish that UT lacked a right of control over Dr. York. In *Starnes,* the Fifth Circuit relied upon the fact that the military doctor's supervising physicians were independent contractors as one reason to hold that the doctor was not a borrowed servant. *Starnes,* 139 F.3d at 542. The Court relied on this as one

factor among others to hold as it did.[8] In addition, *Starnes* was decided before *Wolff,* and the Court in *Starnes* noted that one factor for holding as it did was that the Texas Supreme Court had not yet applied the borrowed servant doctrine to physicians. *Id.* at 543.[9]

It is not clear what weight should be given to the fact that the supervising physician is an independent contractor. This issue does not appear to have been addressed by the Texas courts. In an unpublished decision affirming a decision of this Court, the Fifth Circuit relied on the fact that the military doctor was supervised by hospital staff, rather than independent contractors, as one factor for distinguishing the case from *Starnes,*[10] as did this Court.[11] However, it seems clear to this Court that the issue of the status of the supervising physician is but one of many factors to determine whether a doctor is a borrowed employee. Consequently, the fact that Dr. Sirinek, an independent contractor, was Dr. York's supervising physician on the night in question, does not conclusively estab-

7. *Baptist Mem'l Hosp. Sys. v. Sampson,* 969 S.W.2d 945, 948 (Tex.1998).

8. The Court held that the lack of an express provision regarding control in the governing agreement, the provisions in the agreement which indicated that the government accepted liability, evidence presented by the plaintiffs that the hospital did not supervise or control the medical treatment provided to patients by staff physicians and military residents, and the absence of Texas case law applying the borrowed servant doctrine to physicians, as well as the fact that the supervising doctors were independent contractors, counseled in favor of holding the government liable. *Starnes v. U.S.,* 139 F.3d 540, 543 (5th Cir. 1998).

9. One factor that would counsel in favor of holding the government liable is the fact that the language in the agreement in *Starnes* and the MOU are largely similar. *Starnes* placed weight on the fact that the language of the

governing agreement directed a specific person under whom the military doctor would be under the direct supervision: "the medical specialty teaching chief at the training institution or his/her authorized designee." *Id.* at 542. This person was an independent contractor. It is unclear what weight to give this language from *Starnes.* However, the Court does not accept Plaintiff's argument that the fact that a supervising physician is an independent contractor is dispositive of the issue. Instead, the Court chooses to focus on the circumstances of Dr. York's residency as a whole, taking into consideration Dr. Sirinek's status as well.

10. *McBee v. U.S.,* 101 Fed.Appx. 5 (5th Cir. 2004).

11. *McBee v. U.S.,* No.SA–02–CA–1040–XR (W.D.Tex. Oct. 1, 2003).

lish that UT did not have a right of control. Neither does the fact that Dr. York was able to perform many treatments without immediate supervision. "[T]he [C]ourt is not unmindful of the expansive duties of residents at a hospital." *Id.* The fact of Dr. York's immediate supervision does not impact whether UT had a right to control the details of his activities.

Other factors at issues in this case counsel in favor of the government. Plaintiffs have not provided any evidence from physicians at UT that "the hospital does not supervise or control the medical treatment provided to patients by staff physicians and military residents." *Id.* The language of the MOU suggest that the government and UT drafted the agreement with the understanding that UT would direct the details of Dr. York's residency. Military residents at UT are provided with availability to all of the facilities at the hospital, are provided with storage, dressing, and locker room space, are provided with emergency medical and dental treatment while in the facility, are given the necessary parking or base permits, and are given access to the administrative privileges typically enjoyed by UT's staff. In short, military residents are to be treated as civilian residents employed by UT. UT also arranges the military residents' schedules and designates an official to coordinate their clinical learning experience. The MOU also directs that the military residents will be under the supervision of the "facility officials" of UT. While this brings forth the contentious issue of an independent contractor doctor as the designated supervisor, it is clear the MOU contemplates UT directing who the military residents' supervisors will be. Further, the MOU directs that all professional bills charged for the services of the military residents will be the exclusive property of UT. Therefore, the language of the MOU contemplates that UT will direct the details of the military residents' activities. The government is a passive participant in the residency program, paying the residents' salaries and reaping the benefits of their training during the service period *after* their residencies.

In addition, the nature of a residency program in general suggests that it is the supervising-institution that has the right to control the details of the residents' activities. As recognized by the Texas Supreme Court in *Wolff,* residency programs generally require residents to be supervised by the attending physician and more senior residents. *Wolff,* 94 S.W.3d at 543. The summary judgment evidence establishes that this is the arrangement at UT. The Court in *Wolff* did not distinguish between independent contractor doctors and hospital employee doctors, it only focused on whether the residents were supervised by senior physicians and residents, per Accreditation Council for Graduate Medical Education ("ACGME") rules.[12] *Id.* Further, it cannot be disputed that Dr. York was physically working for UT on the night in question. It is highly unlikely that a patient would expect to look to the government to be accountable for the alleged negligence of Dr. York. It is not clear what Plaintiffs were told at the time of Spriggs's hospitalization, but Plaintiffs have not offered any evidence that would suggest they knew Dr. York was a military

---

12. Under these rules "in general surgery residency programs, the ACGME recognizes that the patient's attending physician is responsible for that patient's care and requires the attending physician to supervise any residents involved in providing that care." *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 521 (Tex. 2002). "[E]ven the most senior resident must be supervised." *Id.*

doctor and that they expected the government to be responsible for his actions.

Considering all the summary judgment evidence, as well as all the factors discussed above, Plaintiffs have failed to show that there is a genuine issue of material fact as to the liability of the government for the alleged actions of Dr. York. While the fact that the physicians supervising Dr. York were independent contractors is one factor weighing in favor of holding the government liable, this factor is not dispositive, and does not seem to be one of overwhelming weight, as the Texas Supreme Court did not raise it as an issue in *Wolff.* Other factors, including the language of the MOU, which seems to grant power over the details of patient care to UT, the intricacies of a residency program in general, and the fact that it is unlikely that Plaintiffs would have expected to look to the government for redress for Dr. York's alleged negligence weigh in favor of immunizing the government. In addition, two recent cases from the Western District of Texas which were argued by the parties also weigh in favor of finding a right to control in UT. In *Klein v. Miller,* 2004 WL 1118725, No. Civ.A.SA–02–CA–687FB, at *2, 2004 WL 1118725 (W.D. Tex. Mar 30, 2004), the court ruled that a VA resident was the borrowed servant of UT under a Policy Memorandum that provided that UT practitioners were responsible for the care of each patient while all residents functioned under the supervision of the staff practitioners. The Memorandum also provided that the supervising staff physicians were accountable for the actions of the resident. The court found the resident was a borrowed employee, even though the residents in the program were assisted by VA hospital employees during their activities. *Id.* at *6. Similarly, in *McBee v. U.S.,* this Court found a virtually identical Memorandum of Understanding, as well as the circumstances surrounding the residency program and the supervision of the military doctor by hospital staff, conclusive in establishing that the supervising-institution, and not the government, was liable for the military resident's alleged negligence. *McBee v. U.S.,* No.SA–02–CA–1040–XR, (W.D.Tex. Oct. 1, 2003), *aff'd* 101 Fed.Appx. 5 (5th Cir.2004). These cases suggest that borrowed servant immunity is a large hurdle over which plaintiffs must jump in order to bring suit against the government in a situation such as this. Plaintiffs have not presented any evidence to contradict the evidence put forward by the government that Dr. York was a borrowed servant and that UT is responsible under principles of *respondeat superior* for any alleged negligence.

## C. Public Policy

■ As a final effort to avoid summary judgment, Plaintiffs argue that immunizing the government in this situation leaves patients who are negligently treated by military doctors performing their residency at independent hospitals without a remedy. Plaintiffs' argument sounds in public policy. As a first response to this argument, the Court notes that Plaintiffs are not left without a remedy. Military residents completing their residency at an independent hospital are under the supervision of attending physicians and senior residents. Depending on the circumstances, the residents' supervisors will likely be liable for any alleged negligence of the resident. In fact, Plaintiffs still maintain their suit against the attending surgeon in this case, Dr. Sirinek. Also, the supervising-institution will be liable for the borrowed employee residents' alleged negligence.

Further, the fact that a certain category of plaintiffs may be precluded from relief in certain circumstances does not automatically run counter to public policy. The

United States Supreme Court has foreclosed this argument in *U.S. v. Smith,* 499 U.S. 160, 111 S.Ct. 1180, 113 L.Ed.2d 134 (1991). In *Smith,* the Court provided immunity to military doctors acting in the course and scope of their employment, even though the FTCA exception at issue in the case precluded recovery for the plaintiffs altogether. Where "the required substitution of the United States as the defendant in tort suits . . . sometimes foreclose[s] a tort plaintiff's recovery altogether," public policy concerns are not implicated. *Id.* at 166, 111 S.Ct. 1180. That is one consequence of suit under the FTCA. Here, Plaintiffs are precluded from relief against the government and against Dr. York because of immunity. This does not violate public policy. Consequently, summary judgment is proper in favor of the government.

## IV. Conclusion

Plaintiffs have sued the United States as the employer of Dr. Gregory York for the alleged negligence of Dr. York leading to the death of Frank Spriggs while Spriggs was in post-operative care at University of Texas Health Science Center. The government claims that it is immune from suit under the Texas borrowed servant doctrine. Under that doctrine, an employer is not liable for the tort of its employee when another entity has the right to control the details of the employee's activities. The Court finds that under the General Agreement and Memorandum of Understanding between the government and UT, as well as under the circumstances of Dr. York's residency at UT, Dr. York was a borrowed servant of UT as a matter of law. The language of the MOU suggests that the government and UT intended for UT to control the details of Dr. York's residency, including his schedule, his training, his privileges, and his supervision. That Dr. York's supervisor may have been an independent contractor is one factor weighing in favor of finding the government liable, but it does not outweigh the factors in favor of applying the borrowed servant doctrine in favor of the government. The Court finds that no genuine issue of fact exists as to whether Dr. York was a borrowed servant under Texas law. Dr. York was a borrowed servant of UT, and therefore the government cannot be held liable for his alleged negligence. Accordingly, the Court GRANTS the government's motion for summary judgment (docket no. 37) and enters judgment in favor of the United States of America.

As the Court has entered judgment in favor of the United States, no original federal jurisdiction remains. The only remaining claim is against Dr. Sirinek, which is presently in this Court under the Court's supplemental jurisdiction. 28 U.S.C. § 1367. Because this case was removed under 28 U.S.C. §§ 1441 and 1442, pursuant to the Federal Tort Claims Act, the Court finds no reasons for this case to remain in federal court. The Court therefore REMANDS this case to the 225th Judicial District Court of Bexar County, Texas. 28 U.S.C. § 1367(c).