**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 2, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

STAR INSURANCE COMPANY,

      Plaintiff Counter Defendant -
      Appellee,

v.

FEDERAL INSURANCE COMPANY,

      Defendant Counterclaimant -
      Appellant.

No. 16-6098
(D.C. No. 5:14-CV-00716-L)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **LUCERO**, **McKAY**, and **HARTZ**, Circuit Judges.
_____

Donald J. Flint is the president of C&C Tank Truck Services, Inc. (C&C) and

D.J.F. Services, Inc. (DJF). He owns all of DJF; he and his wife are each 50% owners of

C&C. C&C, based in Wewoka, Oklahoma, transports fluids for oil-rig operations. DJF,

based in Holdenville, Oklahoma, provides oilfield services and operates ten oil and gas

wells near or in Spur, Texas. Wewoka and Holdenville are nine miles apart, but Spur is

about 340 miles southwest of both. Roger Cellars, a mechanic for C&C, was assigned by

---

[*] After examining the briefs and appellate record, this panel has determined unanimously
that oral argument would not materially assist in the determination of this appeal. *See*
Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted
without oral argument. This order and judgment is not binding precedent, except under
the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R.
32.1.

Flint to work on DJF equipment in Spur. On the return trip he caused a serious motor-vehicle accident. The issue in this case is whether Cellars was a loaned servant of DJF at the time of the accident. If so, Cellars's liability is covered under a policy issued by Federal Insurance Company. If, however, Cellars was acting as an employee of C&C, he was covered under a policy issued by Star Insurance Company. The district court ruled on summary judgment that Cellars was a loaned servant of DJF, and Federal appeals. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

"We review the district court's grant of summary judgment de novo, applying the same standards that the district court should have applied." *Higby Crane Serv., LLC v. Nat'l Helium, LLC*, 751 F.3d 1157, 1160 (10th Cir. 2014) (internal quotation marks omitted). Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review the evidence in the light most favorable to the nonmoving party. *See Higby Crane*, 751 F.3d at 1160.

## I. BACKGROUND

In early March 2012 a DJF pulling unit in Spur needed repair. Flint decided to send Darryl Cornell, who acted as DJF's chief mechanic. Federal contends, and we will assume, that Cornell was an independent contractor, not an employee of DJF. To perform his job, he owned a service truck that carried the tools he needed for work; he had no employees of his own. Chad Collins, a DJF employee, was to accompany Cornell. Flint also instructed C&C supervisor Barry Wood to send Cellars, a mechanic for C&C, to assist on the job. Cornell, however, fell ill, so Cellars and Collins had to go

2

alone. On March 6, Cellars met with Cornell, who told him what he needed to do. Cornell provided his tools and truck, which Cellars and Collins drove to Spur.

In Spur the two men replaced the air compressor on the rig. But when that did not solve the problem, they called Cornell for advice. During some downtime Cellars provided routine maintenance on a C&C truck that had been loaned to DJF for use in Spur.

By March 8, Cornell had gotten permission from his doctor to travel. He borrowed a truck from DJF and drove to Spur to assist Collins and Cellars. Once there, Cornell determined that the others had installed the compressor incorrectly and the motor needed to be taken to Holdenville for repair. He directed Collins and Cellars how to remove the motor from the pulling unit and the two men loaded it into the DJF truck per his instructions.

On March 9, Cornell, Collins, and Cellars drove back to Holdenville. Collins drove the DJF truck with the oil-rig motor in the back, and Cellars followed in Cornell's service truck. Cornell rode with Collins because that truck was more comfortable and Cornell was still not feeling well. The trucks were traveling in Oklahoma when Cellars collided with a car in which Loretta Rolen was a passenger. She sustained serious injuries and sued Cellars, C&C, and DJF.

The suit was settled. The liability insurer for Cornell's truck, as the primary insurer, paid an amount that exhausted its policy limits, and Star (C&C's insurer) and Federal (DJF's insurer) paid equal amounts to fund the rest of the settlement. The two

insurers reserved their rights to recover from each other the moneys paid toward the settlement and for the defense of the underlying suit.

Star then brought this action claiming that Federal was liable for the portion that Star contributed to the settlement because Cellars was a loaned servant to DJF at the time of the accident. Federal counterclaimed that Star was entirely liable because Cellars was a C&C employee who was not acting as a loaned servant to DJF at the time of the accident.

## II. ANALYSIS

The parties agree that we apply Oklahoma law. In Oklahoma an employer is generally liable for the acts of its employees within the scope of employment. *See Bosh v. Cherokee Cty. Bldg. Auth.*, 305 P.3d 994, 998–99 (Okla. 2013), *as corrected* (June 28, 2013). But when an employer loans an employee to another master, the loaned-servant doctrine sometimes renders the temporary employer liable for the acts of the loaned employee. *See Wylie-Stewart Mach. Co. v. Thomas*, 137 P.2d 556, 558–59 (Okla. 1943). The applicable Oklahoma test is: "In the act which the servant was performing at the time, was he in the business of and subject to the direction of the temporary employer as to the details of such act?" *Crutchfield v. Melton*, 270 P.2d 642, 645 (Okla. 1954).

Despite the apparent simplicity of the test, "[t]he application of the loaned servant doctrine in any given case presents one of the nicest questions for any court's determination." *Id.* at 644. Sixty years ago the Oklahoma Supreme Court stated: "In the typical or usual 'loaned servant' case it is not the usual business of the original master to loan or hire out such servant and the business of such master is not directly furthered

4

thereby, the borrowing master alone benefiting from the servant's labor and the original master making no profit from the borrowing of his servant." *Ishmael v. Henderson*, 286 P.2d 265, 268 (Okla. 1955). But almost all the Oklahoma case law on the subject concerns a loaning employer whose business apparently was providing equipment with or without an operator. In that circumstance, there can be fine distinctions regarding how much the loaning employer controls how the loaned servant performs the work. *See, e.g.*, *City Diesel Serv. v. Collier*, 630 P.2d 1293, 1295 (Okla. 1981); *Chickasha Plumbing Co. v. Rogers*, 366 P.2d 410, 412–13 (Okla. 1961); *Wylie-Stewart Mach.*, 137 P.2d at 557; *Hull v. Enid Gen. Hosp. Found.*, 152 P.2d 693, 693–94 (Okla. 1944); *W. Cas. & Sur. Co. v. J. R. Adams, Inc.*, 465 P.2d 794, 795–96 (Okla. Civ. App. 1970). We think it significant that in the two cases we have found where the loaning employer was not in such business, the Oklahoma courts have held that there was a loaned servant. *See Crutchfield*, 270 P.2d at 645 (loaning employer "was not engaged in the business of hiring out tractors and bulldozers with drivers for them"); *Oklahoma Ordnance Works Auth. v. Garrison*, 424 P.2d 983, 985 (Okla. 1967) (loaning employer exchanged cranes and operators with another company for a single assignment). In that circumstance— when the loaned servant is in no sense performing the work of the loaning employer—the analysis of who has control is much simpler.

That is the circumstance here. C&C was in the business of transporting fluids, not the business of hiring out mechanics to repair oilfield equipment. When Flint directed one of his C&C employees to travel more than 300 miles from headquarters to work on equipment of his other company, DJF, he was temporarily relinquishing any interest of

5

C&C in that employee's work. It is undisputed that Flint's control of the employee—directing him where to go and what to work on—was in his capacity as president of DJF, and that no purpose of C&C was being served. Federal has not disputed these facts. Federal points out that C&C's manager, Barry Wood, testified that he generally could recall C&C employees who were doing some work for DJF, but, as the district court explained, that testimony was taken out of context. When asked about Cellars's trip to Spur, Wood said that the assignment was ordered by Flint and that during the trip Cellars was unavailable to him for C&C purposes. It would strain belief to say that he had authority to override his boss and on his own order Cellars to return 340 miles. *See Carney v. City and Cty. of Denver*, 534 F.3d 1269, 1276 (10th Cir. 2008) ("Although our summary judgment standard requires us to view the facts in the light most favorable to the non-moving party, it does not require us to make unreasonable inferences in favor of the non-moving party." (brackets and internal quotation marks omitted)).

Federal argues that C&C retained authority to control Cellars because it paid for his time and expenses during the Spur trip. The evidence on this point is mixed. Cellars continued his usual practice of turning in daily timesheets to C&C during the period when he was in Spur. He also received his usual biweekly paycheck from C&C for that pay period, and the paycheck included his usual allowances of $25 toward a cell phone and $25 toward work clothes. DJF did not reimburse C&C for Cellars's wages and allowances. But Flint gave additional money to Collins for the Spur trip so that he and Cellars could pay for meals, housing, and gas. He testified that this money "came from DJF." Aplt. App. Vol. I at 88. In any event, who paid for what is not particularly

6

significant in determining whether Cellars was a loaned servant: "The mere fact that the general employer continues to pay the wages of the wrong doer will not make him liable for the wrongful act where it appears that the person to whom he was lent controls him entirely in regard to the work to be done." *Wylie-Stewart Mach. Co.*, 137 P.2d at 559 (internal quotation marks omitted); *see City Diesel Serv.*, 630 P.2d at 1295 ("[Several factors, including] the obligation to pay his wages are merely incidental indicia of the control and not exclusively determinative.").

Federal also points to Flint's testimony that Cellars continued to be C&C's employee during the Spur trip. But this would always be the situation when there is a loaned-servant issue. The loaned-servant doctrine would add nothing to the law if it required "an out and out change of employment." *Wylie-Stewart Mach. Co.*, 137 P.2d at 558; *see Spriggs v. Sirinek*, 402 F. Supp. 2d 739, 743 (W.D. Tex. 2004) (The loaned-servant "doctrine applies in the situation . . . in which an employee of one entity is 'loaned' to another entity, but maintains his employment with the first entity."). The doctrine presupposes that Cellars remained a C&C employee in Spur; the only question is whether DJF became responsible for his on-the-job tort.

A related fact relied on by Federal is that after Cellars's return from Spur, Flint prepared a disciplinary memorandum memorializing Cellars's deficient performance before the Spur trip and during the Spur assignment, including his causing the accident when returning from Spur. The memorandum was signed by Flint in his capacity as president of C&C and was placed in Cellars's C&C personnel file. But this proves only that Cellars was an employee of C&C. He did not have a DJF personnel file, so the only

7

place Flint could keep that memorandum was in Cellars's C&C file. These facts have no bearing on whether Cellars was loaned to DJF for the Spur assignment.

We also think it largely irrelevant that Cellars worked on a C&C vehicle that happened to be in Spur at the time. There is no evidence that he was directed to perform that work by C&C or anyone else. It was simply a matter of doing some routine maintenance during "downtime" on his DJF assignment. Aplt. App. Vol. I at 193. It was a nice thing to do (and probably something he enjoyed doing). And his work helped DJF at least as much as C&C because the truck had been loaned to DJF. In any event, the maintenance work in no way signifies who had authority to control his other work; it was at most a hiatus in his DJF duties. *Cf. Palmer v. Bassett*, 95 P.2d 872, 876 (Okla. Sup. Ct. 1939) (employer's liability for employee's tort resumed when employee returned from interruption in service).

Federal also presents an argument concerning who controlled Cellars during the Spur trip. First, it notes that Cellars apparently received no further direction from Flint, or anyone else at DJF, after he departed for Spur. But whether DJF exercised control is not the question; the relevant consideration "is the right to control a servant rather than the exercise of it," *Chickasha Plumbing Co. v. Rogers*, 366 P.2d 410, 413 (Okla. 1961). Telling a mechanic where to go and what to fix is typical control by an employer.

Federal then asserts that it was Cornell, an independent contractor, who directed Cellars's work while he was in Spur, and even before his departure to Spur. Federal suggests that therefore Cellars was a loaned servant of Cornell, not DJF, or at least that DJF lacked the complete control over Cellars necessary to make him a loaned servant.

8

We are not persuaded. The role of both Cornell and Cellars was to do the business of DJF; neither was there to do the business of the other. Cornell testified that Flint, not he, had the ultimate authority to control Cellars's actions. And Flint exercised that authority by sending Cellars to Spur to work with Cornell on the repairs. The difference between Cornell and Cellars was that Cornell had special expertise regarding DJF equipment that Cellars lacked. Even if Cornell was an independent contractor, not an employee of DJF, an employer does not relinquish the right to control an employee (or a loaned servant) by directing the employee to obtain expert guidance. Federal has supplied no authority, and we know of none, that when a lending employer uses an independent contractor to give the loaned servant direction in performing the lending employer's work, he or she thereby reverts to being the general employer's employee or becomes the loaned servant of the person giving directions. Case authority points the other way. *Cf. Akers & Van Hook Const. Co. v. Beller*, 356 P.2d 738, 740 (Okla. 1960) (employee X of company A was given direction by employee Y of company B but did not become loaned servant of B because Y was acting as agent of A); *Spriggs*, 402 F. Supp. 2d at 743 (Air Force physician remained hospital's loaned servant despite direct supervision from independent-contractor surgeon). These authorities have particular force given Cornell's intimate relationship to DJF even if he was an independent contractor. Cornell acted in the capacity of chief mechanic for DJF, was working almost exclusively, if not exclusively, for DJF (although Flint occasionally loaned him to C&C), and regularly supervised DJF employees (such as Collins). Cellars was working for DJF, not Cornell.

9

Finally, Federal argues that even if Cellars was a loaned servant of DJF in Spur, that relationship ended before the trip home when the accident occurred. We disagree. Returning to DJF headquarters was an obvious and implicit part of the Spur assignment. And Cellars was serving DJF's interest by bringing back Cornell's truck, which contained the tools that Cornell uses to fix DJF equipment. Indeed, even if one could say that Cellars was subject to detailed control of his work by Cornell while he was in Spur, that was not the case on the drive home. There is no evidence that Cornell gave him any instructions. Rather it was Collins, a DJF employee, who was leading the way back from Spur.

In sum, the district court properly concluded from undisputed facts that Cellars was the loaned servant of DJF when he caused the accident.

### III. CONCLUSION

We **AFFIRM** the judgment of the district court.

Entered for the Court


Harris L Hartz
Circuit Judge