FILED
United States Court of Appeals
Tenth Circuit

**July 24, 2008**

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

MELINDA K. CARNEY,

      Plaintiff-Appellant,

v.

THE CITY AND COUNTY OF
DENVER,

      Defendant-Appellee.

No. 06-1490

---

**Appeal from the United States District Court
for the District of Colorado.
(D.C. No. 05-cv-00971-REB-PAC)**

---

Gregory A. Eurich (Steven C. Choquette and Becky Bye with him on the briefs),
Holland & Hart LLP, Denver, CO, for Plaintiff-Appellant.

Robert D. Nespor, Assistant City Attorney, Denver, CO, for Defendant-Appellee.

---

Before **McCONNELL**, **EBEL,** and **GORSUCH**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

      Plaintiff-Appellant Melinda K. Carney ("Carney") appeals the district

court's grant of summary judgment in favor of Defendant-Appellee the City and

County of Denver ("the City"), in relation to her claims of racial discrimination and retaliation arising under 42 U.S.C. § 1981. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## I. BACKGROUND

Ms. Carney is a black female. In 1991, she sought employment with the City as a police officer. Her application, however, was rejected. Ms. Carney responded to her rejection by filing a charge of discrimination with the Colorado Civil Rights Division ("CCRD"). For reasons that are not clear from the record, although the CCRD found probable cause to support Ms. Carney's claim of discrimination, Ms. Carney did not file suit against the City at that time. Instead, Ms. Carney opted to continue her pursuit of employment with the City as a police officer.

In 1996, Ms. Carney again applied to the City for a position as a police officer. This time, Ms. Carney successfully completed the required examination process, making her eligible for employment consideration. Her application was again unsuccessful, however, as the Manager of Safety determined that Ms. Carney failed to surmount the "Rule of III."

In response to this second rejection, on April 5, 1999, Ms. Carney filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Pursuant to this charge, Ms. Carney alleged she was discriminated against by the City because she is black. Thereafter, on February 18, 2000, Ms.

- 2 -

Carney initiated a lawsuit against the City. This lawsuit was subsequently settled pursuant to an agreement whereby Ms. Carney would submit, under a modified hiring procedure, a third application to the City's police department.

Ms. Carney's third application was successful, and on January 6, 2003, Ms. Carney was appointed to the Denver Police Academy. Soon after her appointment to the police academy, however, Ms. Carney was greeted with more adversity. Indeed, on her very first day, Ms. Carney alleges that she was told by an instructor "that there was a general consensus among the Academy Staff that [she] did not belong" and that she "needed to be careful." Just six days later, on January 12, 2003, these words proved prophetic as Ms. Carney injured her Achilles tendon and was placed on limited duty with restrictions.

Ms. Carney's misfortunes did not end there. According to Ms. Carney, "[f]rom the date of [her] injury through [her] release to full duty on May 27, 2003, [she] was subjected to ... harassment perpetrated ... by Academy staff or with full knowledge, acquiescence and approval of Academy staff...." This harassment included physical abuse inflicted on her by fellow recruit Brian Lang, who during a training exercise allegedly "continued to forcibly twist [Ms. Carney's] wrist after [she] indicated that it was excruciatingly painful." In this same vein, during subsequent training exercises, Lang allegedly "struck [Ms. Carney] on the back of [her] hand with [a] gun" and "elbowed [her] across the mouth, causing [her] lip to split and bleed."

In addition to such physical misconduct, Ms. Carney alleges she also fell victim to nonphysical transgressions as well. For instance, Ms. Carney asserts that "she was subjected to discipline that was inconsistent with or in violation of applicable disciplinary procedures." Moreover, she alleges that she "was verbally abused and physically threatened by a supervisor." On top of these allegations, Ms. Carney claims that her "recruit badge" was taken away without cause and that "[c]hanges were made to the results of one or more of [her] driving tests, to cause [her] performance to appear worse than it actually was."

Life at the police academy did not improve for Ms. Carney when she was released from the physical restrictions imposed on her as a result of her Achilles tendon injury. Indeed, on the very day she was released from these restrictions, Ms. Carney participated in a training exercise known as the "Baton Ring of Death," where she was "continually struck ... in the face and on the back of the head," "knocked out of the ring onto [a] concrete floor," and then "deliberately and intentionally assaulted," by the aforementioned Brian Lang. This alleged misconduct – which Ms. Carney asserts violated a number of rules governing the Baton Ring of Death – resulted in Ms. Carney breaking her ankle. When she attempted to respond by filing an Internal Affairs complaint against Lang, Ms. Carney claims she was told "not to do so as it would jeopardize [her] career."

Following her ankle injury, things only continued to get worse for Ms. Carney. She alleges that she was subjected to further verbal abuse by her supervisors and moreover alleges that additional exam scores were unfavorably altered. The Rocky Mountain News evidently caught wind of Ms. Carney's struggles and on August 1, 2003, published an extensive article regarding her arduous path to becoming a Denver police officer. Subsequent to this article's publication, Ms. Carney asserts that she was subjected to further retaliatory and discriminatory treatment, including unwarranted transfers and assignments.

On May 27, 2004, Ms. Carney was forced to undergo extensive surgery on her previously broken ankle. According to Ms. Carney, "[s]ubsequent to that surgery, Denver's worker's compensation unit ... repeatedly and seriously interfered with [her] receipt of medical treatment and [her] recovery." Specifically, Ms. Carney complains that she has fallen victim to unilateral cancellations of physical therapy sessions as well as unilateral rejections of physician-recommended procedures. Additionally, Ms. Carney asserts that the workers' compensation unit has pressured her surgeon to declare her to be at maximum medical improvement.

Ms. Carney's ankle injury has wrought significant hardship on her life and career. "A doctor [for the City] ... concluded that [she has become] permanently disabled ... and ... will never be able to run or jump in the manner expected of

police officers."  Perhaps with this in mind, the City "put [Ms. Carney] on terminal medical leave, expressing the intention to have [her] medically retired."

In response to this string of events, Ms. Carney filed suit against the City asserting claims of race discrimination and retaliation pursuant to 42 U.S.C. § 1981 and 42 U.S.C. § 1983.  The City moved for summary judgment on Ms. Carney's section 1981 claims.[1]  Agreeing with the City that Ms. Carney failed to produce evidence establishing a viable section 1981 claim of either race discrimination or retaliation, the district court granted summary judgment in the City's favor.  In doing so, the court limited its analysis to whether the evidence produced by Ms. Carney was sufficient to give rise to municipal liability under section 1981.   The court found Ms. Carney's evidence insufficient in this regard and concluded that this lack of evidence was fatal to her claims.  Ms. Carney now appeals.

## II. DISCUSSION

### A. Standard of Review

"This court reviews the district court's summary judgment decision <u>de novo</u>, viewing the evidence in the light most favorable to the non-moving party; in this case, in [Ms. Carney's] favor."  <u>Herrera v. Lufkin Indus., Inc.</u>, 474 F.3d 675, 679-80 (10th Cir. 2007).  Summary judgment is appropriate "if the

---

[1]  Ms. Carney consented to the dismissal of her section 1983 claims.

pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

## B. Racial Discrimination

"In racial discrimination suits, the elements of a plaintiff''s case are the same whether that case is brought under §§ 1981 or 1983 or Title VII." Baca v. Sklar, 398 F.3d 1210, 1218 n.3 (10th Cir. 2005) (quotation and alterations omitted). "To make out a prima facie case of discrimination, [Ms. Carney] must demonstrate (1) membership in a protected class, (2) adverse employment action, and (3) disparate treatment among similarly situated employees." Orr v. City of Albuquerque, 417 F.3d 1144, 1149 (10th Cir. 2005). Additionally, in order for municipal liability to arise under section 1981, Ms. Carney must demonstrate that the City's officials acted pursuant to a "custom or policy" of "discriminatory employment practices." Randle v. City of Aurora, 69 F.3d 441, 446 n.6, 447 (10th Cir. 1995) (citing Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 735-36 (1989)).[2]

The district court granted the City's Motion for Summary Judgment entirely on the basis that Ms. Carney could not demonstrate "that an official policy or

---

[2] Had Ms. Carney brought her suit under Title VII she could have avoided the obligation to prove a "custom or policy." But she did not do so. Because she founders on the custom or policy prong of § 1981, the courts are unable to address what might otherwise be a case of discrimination or retaliation.

custom was the moving force behind the alleged violation of her constitutional rights." We agree with the district court that this factor is dispositive, and therefore focus our analysis on this element of Ms. Carney's claim.

### 1. Policy or Custom

"An unconstitutional deprivation is caused by a municipal 'policy' if it results from decisions of a duly constituted legislative body or an official whose acts may fairly be said to be those of the municipality itself." Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d 1157, 1177 (10th Cir. 2003) (emphasis added). Ms. Carney has neither alleged nor produced any evidence suggesting that her purported discrimination was caused by any legislative action or by "an official whose acts may fairly be said to be those of the municipality itself." Accordingly, in order to defeat summary judgement, Ms. Carney must produce evidence that her alleged discrimination was the result of a municipal custom.

A "'custom' has come to mean an act that, although not formally approved by an appropriate decision maker, has such widespread practice as to have the force of law." Id. In order to establish a custom, the actions of the municipal employees must be "continuing, persistent and widespread." Gates v. Unified Sch. Dist. No. 449, 996 F.2d 1035, 1041 (10th Cir. 1993). In attempting to prove the existence of such a "continuing, persistent and widespread" custom, plaintiffs most commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way. Indeed, a plaintiff's "failure to

allege the existence of similar discrimination as to others seriously undermines her claim that the City maintained a custom of discriminatory personnel practices." Randle, 69 F.3d at 447.

## 2. Ms. Carney's Statistical Evidence

In attempting to establish the existence of a custom of racial discrimination in the City's police department, Ms. Carney relies solely on statistical evidence. This statistical evidence is contained in Ms. Carney's own affidavit and states as follows:

> During work I did on temporary assignment in the Denver Police Department's Research and Development Unit, I was asked to undertake research regarding minority representation in the Department. Through my review of the Department's data, I determined that African-American females like me account for well under one percent of the [D]epartment's roughly 1,550 officers, a figure well below the presence of African-American females in the general population of Denver. Further, I determined that on the Department's roughly 35-person command staff, there was only one African-American female commander (there are now two). I also determined that the statistics for African-American women in the rank of Lieutenant and Sergeant was [sic] very low, basically a handful of each in groups of roughly 85 Lieutenants and 175 Sergeants.

In relying on this statistical evidence, Ms. Carney cites to Hazelwood School District v. United States, 433 U.S. 299, 307-08 (1977), for the proposition that "[w]here gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination." We do not need to decide whether the disparities Ms. Carney

- 9 -

asserts are sufficiently "gross" to constitute prima facie proof of a custom of

discrimination because, in any event, numerous problems pervade Ms. Carney's

statistics which fatally impair their probative value.

First, Ms. Carney's statistical sample is mistakenly limited to black

females. Accordingly, one cannot discern from Ms. Carney's statistics whether

blacks in general – male and female – are less represented in the City's police

department than they are represented in the City's population as a whole. This is

important, as Ms. Carney did not allege she was discriminated against because she

is a <u>black female</u>, rather, she alleged she was discriminated against only because

she is <u>black</u>. Because Ms. Carney's statistical sample is limited to black females,

it has little probative value in establishing a custom of generalized race

discrimination against all blacks in the City's police department.[3]

---

[3] Ms. Carney asserts that her statistical sample ought to pose no problem because "courts have held that African-American women are a distinct subgroup protected from discrimination." (Aplt. Br. at 28) (citing <u>Jeffries v. Harris County Cmty. Action Ass'n</u>, 615 F.2d 1025, 1034 (5th Cir. 1980)). This, however, is meaningless. Ms. Carney did not pursue a cause of action that alleged she was discriminated against because she is a <u>black female</u>, rather, Ms. Carney alleged she was discriminated against because she is <u>black</u>. Ms. Carney also relies on <u>Hicks v. Gates Rubber Co.,</u> 833 F.2d 1406, 1416 (10th Cir. 1987), for the proposition that "[t]his Court has allowed aggregation of evidence of racial hostility in affirming a verdict in favor of an African-American woman." (Aplt. Br. at 28.) <u>Hicks</u>, however, is inapposite to the case at hand. <u>Hicks</u> was not a case where the plaintiff sought to prove a custom solely through statistical evidence. Moreover, <u>Hicks</u> involved a case in which a black female alleged she was the victim of both racial and sexual harassment. Accordingly, it made perfect sense for the court to allow evidence of the sexual harassment experienced by

(continued...)

Second, Ms. Carney's statistical evidence is not limited to a qualified applicant pool. This makes it impossible to discern whether any discrimination has in fact occurred. For example, if black females constituted less than 1% of the qualified applicant pool, then Ms. Carney's testimony would show that, rather than being discriminated against, black females have in fact been over selected. This is why the "proper comparison [is] between the racial composition of [the City's police department] and the racial composition of the qualified [applicant pool] in the relevant labor market." Hazelwood, 433 U.S. at 308. Accordingly, "statistics based on an applicant pool containing individuals lacking minimal qualifications for the job [are] of little probative value." Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 996 (1988).

Third, Ms. Carney's statistical evidence, if anything, addresses the hiring and promotion practices of the City's police department. Ms. Carney's claims, however, are not based on an alleged failure to hire or promote, thus again rendering her statistics of little probative value. Ms. Carney's evidence does not speak to whether the City also had a custom of discriminating against black police officers in the daily operation of the police department.

---

[3](...continued)
other employees when determining whether a hostile work environment existed. Such evidence went directly to the plaintiff's own claim of sexual harassment.

- 11 -

Fourth, even if this court were to ignore the numerous problems already noted, Ms. Carney offers no indication whether the statistical disparities she cites are statistically significant. Furthermore, Ms. Carney performed no statistical analysis on the data – such as a multiple regression analysis – that may establish whether nondiscriminatory explanations – i.e, the possibility that few applications were received from black females, the possibility that the black females who did apply were not as qualified as other applicants, the possibility that few black females sought promotions, and so forth – exist for the disparities she cites. As this court has previously stated, "[i]n order for statistical evidence to create an inference of discrimination, the statistics must ... eliminate nondiscriminatory explanations for the disparity. In other words, a plaintiff's statistical evidence must focus on eliminating nondiscriminatory explanations for the disparate treatment by showing disparate treatment between comparable individuals." Rea v. Martin Marietta Corp., 29 F.3d 1450, 1456 (10th Cir. 1994). Ms. Carney's statistical evidence does no such thing.

Accordingly, the record provides no basis on which a rational fact finder could conclude that racial discrimination against black police officers was so widespread in the City's police department so as to constitute a custom. Although "[o]ur summary judgment standard requires us to view the facts in the light most favorable to the non-moving party[,] it does not require us to make unreasonable inferences in favor of the non-moving party." Starr v. Downs, 117 Fed. App'x

64, 69 (10th Cir. 2004) (unpublished).  Thus, we agree with the district court that the City was entitled to summary judgment on Ms. Carney's racial discrimination claim.

In agreeing with the district court, we are by no means passing judgment on whether Ms. Carney was in fact discriminated against.  Ms. Carney's allegations are no doubt serious and unfortunate.  Nevertheless, our opinion is predicated on the fact that Ms. Carney has failed to produce evidence suggesting that any such discrimination was the result of a policy or custom of the City's police department.  Such evidence is necessary to sustain a claim for municipal liability.

## C.  Retaliation

"To state a prima facie case of retaliation, [Ms. Carney] must show that: (1) she engaged in a protected activity; (2) [the City] took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action."  Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d 1164, 1171 (10th Cir. 2006) (footnote omitted).  Additionally, as seen in relation to Ms. Carney's discrimination claims, in order for municipal liability to arise under section 1981, Ms. Carney must demonstrate that the City's officials retaliated against her pursuant to a "custom or policy" of retaliation.  Randle, 69 F.3d at 446 n.6.

As with Ms. Carney's discrimination claim, the district court granted the City's Motion for Summary Judgment entirely on the basis of its belief that Ms.

Carney could not demonstrate "that an official policy or custom was the moving force behind the alleged violation of her constitutional rights." We agree with the district court that this factor is dispositive, and therefore focus our analysis on this element of Ms. Carney's claim.

### 1. Policy or Custom

The municipal liability analysis for Ms. Carney's retaliation claim is the same as that which was previously discussed in relation to her discrimination claim. As with her discrimination claim, Ms. Carney did not assert that the alleged retaliation she experienced was caused by any legislative action or by an official whose acts may fairly be said to be those of the City itself. Therefore, to sustain her retaliation claim, Ms. Carney must offer evidence tending to show that the City's police department had a custom of retaliating against individuals who filed EEOC complaints or related lawsuits. Again, a "'custom' has come to mean an act that, although not formally approved by an appropriate decision maker, has such widespread practice as to have the force of law." Marshall, 345 F.3d at 1177.

### 2. Anecdotal Evidence

Ms. Carney has offered one piece of evidence in her attempt to establish that the City's police department had a custom of retaliation: a March 13, 2006, charge of discrimination filed with the EEOC by officer Jimmy Martinez against the City's police department. Martinez's charge claimed that "[p]rior to June 15,

2004 and continuing" he was the victim of national origin discrimination and retaliation. Specifically, Martinez's charge explained that he was "subjected to adverse terms and conditions, job assignment[s], and promotion[s] and ongoing harassment that ... created a hostile work environment." Importantly, Martinez noted that after he "complained about the hostile environment and racially derogatory comments" he "was moved to the graveyard shift."

In asserting that Martinez's EEOC charge may give rise to an inference that the City's police department had a custom of retaliation, Ms. Carney relies on <u>Melton v. City of Oklahoma City</u>, 879 F.2d 706, 725 n.26 (10th Cir. 1989), for her claim that "the fact that *one other person* was subjected to similar discrimination" might be sufficient to give rise to an inference that such a custom exists. Ms. Carney's reliance on <u>Melton</u>, however, is misplaced. In <u>Melton</u>, the court's decision on municipal liability was based on the actions of a "final policymaker" (a theory that Ms. Carney has never advanced). <u>Melton</u>, 879 F.2d at 725. It was only in dicta that the court asserted that evidence of a similarly situated individual who was retaliated against "might also be sufficient to show the existence of an unconstitutional municipal policy giving rise to section 1983 liability." <u>Id.</u> at 725 n.26. And that dicta only suggests that such evidence "might" be sufficient in an appropriate case. That suggestion does not possess sufficient specificity to be of much assistance to Ms. Carney here.

Melton's far different fact pattern also limits its applicability to this case. Specifically, the alleged retaliation experienced by Melton and the similarly situated individual in that case arose out of the same matter. Under such similar, indeed nearly identical circumstances, it was understandable for the court to suggest that such evidence might be persuasive as to whether the municipality may have had a "pattern or practice" of retaliating under such circumstances. Id. No such similarities exist, however, between the retaliation claims pursued by Martinez and those pursued by Ms. Carney. While Martinez alleges he was retaliated against for informal complaints about a hostile work environment, Ms. Carney alleges she was retaliated against for filing an EEOC charge of discrimination and later maintaining a lawsuit against the City, all before she was even under the City's employ. These are not similar circumstances.

In this case, we need not and do not decide whether only one piece of anecdotal evidence may be sufficient to establish a custom. It is clear, however, that although less precision may be tolerated if many anecdotes are offered, when few anecdotes are offered, they should be closely analogous to the circumstances in the case at bar. Of course, the number of similar, but unrelated, incidents and the closeness of the fit required will vary based, inter alia, on the size of the employer, the length of the time-frame in which the alleged retaliatory conduct took place, and the nature of the alleged retaliation. Practically speaking, if an employer has many employees, it likely follows that more employees will have

experienced retaliation if such a custom exists. Under such circumstances, it also follows that more anecdotes ought to be required in order to support an inference that there is a custom of retaliation. While it is obviously impossible to draw any precise lines in this regard, and cases will no doubt vary based on their unique circumstances, this is an issue of which courts and litigants should be aware.

Ms. Carney attempts to overcome these notions by relying on the fact that Martinez's EEOC charge also asserts that "he and other similarly situated individuals have been discriminated against based on ... national origin, Hispanic, and in retaliation, in violation of TVII [sic] of the Civil Rights Act...." Ms. Carney evidently believes this ambiguous statement provides more anecdotes that a custom of retaliation exists in the City's police department. According to Ms. Carney, "[t]here is no reason that testimony by a third party ... of a pattern of retaliation should not be ... probative in demonstrating a custom of discrimination."

The problem for Ms. Carney is that Martinez did not offer this statement in the form of testimony or an affidavit in her case. Rather, this statement is only contained as an allegation in Martinez's EEOC charge and it offers <u>no</u> specific testimony about the alleged retaliation experienced by others. Instead, the charge merely indicates that Martinez believes others have been retaliated against. It would be extraordinary if this bare, ambiguous accusation, offered by a third party in an unrelated proceeding, containing no detail whatsoever, could support a

- 17 -

finding that the City had a custom of retaliating against individuals similarly situated to Ms. Carney. If Ms. Carney wished to use this accusation in order to create a genuine issue of material fact, at a minimum, she could have obtained an affidavit from Martinez detailing his accusations. This, however, she did not do.

Accordingly, the record provides no basis on which a rational fact finder could conclude that retaliation against individuals who filed EEOC complaints or initiated related lawsuits was so widespread in the City's police department so as to constitute a custom. Ms. Carney's reliance on Martinez's EEOC charge is misplaced, as the two are not similarly situated in any respect other than being police officers. Thus, we agree with the district court that the City was entitled to summary judgment on Ms. Carney's retaliation claim.

## CONCLUSION

We agree with the district court that Ms. Carney failed to produce sufficient evidence to survive summary judgment on the issues of whether the alleged discrimination and retaliation she experienced were wrought by a municipal custom. The decision of the district court is therefore **AFFIRMED**.