**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 10, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

RONALD DWAYNE BROWN,

     Plaintiff - Appellee,

v.

THE  CITY OF COLORADO SPRINGS;
PETER CAREY, Chief of Police, Colorado
Springs Police Department, in his official
and individual capacity; VINCE NISKI,
Deputy Chief of Police, Colorado Springs
Police Department, individually and in his
official capacity; LT. SALVATORE
FIORILLO, III, Unit Commander, Tactical
Enforcement Unit (Swat Team), Colorado
Springs Police Department, individually
and in his official capacity; SGT.
RONALD SHEPPARD, Colorado Springs
Police Department, individually; SGT.
CHRIS ARSENEAU, Colorado Springs
Police Department, individually; OFFICER
DAN CARTER, Colorado Springs Police
Department, individually; OFFICER
WILLIAM P. BETTS, Colorado Springs
Police Department, individually; OFFICER
ROBIN MCPIKE, Colorado Springs Police
Department, individually; OFFICER
SHAWN MAHON, Colorado Springs
Police Department, individually; OFFICER
MARCUS VAN OONYEN, Colorado
Springs Police Department, individually,

     Defendants - Appellants.
_____

No. 16-1206
(D.C. No. 1:14-CV-01471-RPM)
(D. Colo.)

## ORDER AND JUDGMENT[*]
_____

Before **HARTZ**, **MATHESON**, and **PHILLIPS**, Circuit Judges.
_____

Qualified immunity "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "[T]he clearly established law must be 'particularized' to the facts of the case" and may not be defined at a high level of generality. *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Here, we consider whether ten police officers violated a suspect's clearly established Fourth Amendment rights when they detonated an explosive device while executing an arrest warrant. Under the facts of this case, we conclude that the officers didn't do so. We decline to exercise pendent appellate jurisdiction over Brown's municipal-liability and official-capacity claims.

## BACKGROUND

### I.    Factual Background

On May 29, 2012, at 11:55 p.m., officers used a robot to place an explosive device in Ronald Brown's living room. Officers designed a frame for the explosive

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

device to create a 16-by-16-inch hole in the floor. The explosive device worked as expected and blew a hole that size in the floor. Contrary to the officers' belief that Brown would be in a back basement room, away from the blast, Brown was lying directly below the blast. The debris from the blast landed on Brown, broke his leg, and caused shrapnel wounds. All told, Brown spent 12 to 14 days in the hospital's intensive-care unit. The explosion was the culmination of events that started two days earlier.

## A.      Events Leading to Brown's Arrest

On May 27, 2012, at about 6:30 p.m., Brown was involved in an altercation with a neighbor. Earlier, a thirteen-year-old boy had been swinging from a tree outside Brown's townhome when the branch broke. Brown came out of his townhome, chased the boy with a baseball bat, and threatened to kill him.[1] The boy ran to his neighboring townhome and told his mom and her boyfriend. The boy's mother and her boyfriend, armed with a baseball bat, confronted Brown outside of his townhome. After the three argued for a few minutes, Brown pulled out a revolver and fired a shot into the ground. He then threatened to shoot the boy's mother and her

---

[1] In his Appellate Brief, Brown disagrees that he threatened to kill anyone. But Brown presents no evidence disputing the government's affidavits and evidence, meaning he has failed to meet his summary-judgment burden of supporting his claim by "(A) citing to particular parts of materials in the record. . . or (B) showing that . . . an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Evidence that is "merely colorable" or "not significantly probative" is insufficient to create a genuine factual issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

boyfriend. The boy's mother and her boyfriend retreated to their townhome, and someone called the police. Brown returned to his townhome.

Within 15 minutes of the call, police officers arrived at Brown's townhome. After they arrived, the officers spent thirty minutes knocking on Brown's door and yelling for him to come out. But no one answered the door, and the officers saw no movement inside the townhome. Officers called Brown and left several messages on his cell phone, urging him to return their call so they could get his side of the story. From witnesses, officers learned that the mother's boyfriend had approached Brown in the street with a baseball bat, leaving the officers unsure whether Brown had been defending himself. Because they couldn't tell whether Brown was inside his home, officers left after two hours.[2]

After leaving, officers continued calling Brown and sending him text messages. The next morning, Brown responded to the text messages as follows:

> My side of the story? They let their destructive brats run unsupervised. When you call them on it, you're a racist, white devil etc. I'm not getting ripped off.

> like last time where CSPD protected the TSA crooks. Maketa made a mistake. Post 198 EPSO 205. I don't charged for defending myself. I feared for my life. I want my attorney, lawyer up. Or Balls to the, drop the hammer. Your call.

---

[2] Officers were unsure whether Brown had left the townhome in the time it took them to arrive.

4

Appellant's App. at 88.[3] Officers texted back, "Ron we need to work through this. I will come to you with one officer and your lawyer. Call me at 499-1999." *Id.* Brown didn't respond.

After they left Brown's townhome, the officers kept investigating. Among other things, they learned that Brown had served in the military and that he was heavily armed and potentially dangerous. Officers obtained an incident report from two years earlier, revealing that Brown, a former Transportation Security Administration (TSA) employee, had threatened his fellow TSA employees at the Colorado Springs Airport. Officers learned that at the time of the TSA investigation Brown had lawfully owned seven firearms. But the officers also learned that the TSA-related threats had amounted to a misdemeanor and that Brown had no criminal history.

On May 28, the next day, officers returned to Brown's townhome. During this time, they talked to Lucy Boyer, the upstairs occupant of Brown's townhome. Ms. Boyer told the officers that Brown suffers from Post-Traumatic Stress Disorder (PTSD). Ms. Boyer also said that Brown goes into "war mode," which she compared

---

[3] Brown argues that we lack jurisdiction because Defendants failed to designate a complete record. But, as Defendants accurately note, "An appellee who believes that the appellant's appendix omits items that should be included may file a supplemental appendix . . . ." 10th Cir. R. 30.2(A)(1). Brown included the materials he believes we should consider in his supplemental appendix. We have carefully reviewed Appellant's Appendix and Appellee's Supplemental Appendix. We are confident that the parties have presented a sufficient record for us to review the district court's summary-judgment decision.

to the conduct depicted in the movie Blackhawk Down, and said that there would be a "blood bath"[4] if any officers tried to enter the townhome. *Id.* at 92.

Officers also spoke with Brown's ex-girlfriend, Mary Hankins. Ms. Hankins told the officers that Brown had PTSD and anxiety disorders and that he kept a lot of guns in his townhome. She also said that "police should not attempt to enter his residence and arrest him because he did not like police." *Id.*

Next, officers talked to Brown's mother, Pauline Brown. Ms. Brown told the officers that her son had served twenty years in the Army, had PTSD, and suffered from an anxiety disorder. Ms. Brown said that she had exchanged text messages with her son after the incident. Though she did not say whether Brown had been drinking on May 27 or 28, she did say that at some unspecified time he had started drinking heavily.

On May 28, officers obtained a warrant for Brown's arrest.

## B.      The Day of the Arrest

On May 29, two days after Brown's altercation with his neighbor, officers talked to the attorney who had represented Brown in the TSA incident, and again talked to Ms. Brown. Brown's attorney said that he had tried calling Brown after Brown's mother called him but that his calls went to Brown's voicemail. Ms. Brown said that she had sent her son a text message at 9:30 a.m. asking him to surrender, but

---

[4] Brown disputes that Ms. Boyer used the phrase "blood bath," but again fails to refute the affidavit of the policeman who claims that she did. Appellant's App. at 92.

that Brown had responded with a "concerning" message saying that he could not live with his neighbors intimidating him. *Id.* at 122–23. Ms. Brown also gave officers the name of Brown's friend, Brian Sheridan.

At 2:59 p.m., officers called and talked to Lucy Boyer again. Ms. Boyer said that Brown was currently "in a war zone" and that this wasn't the first time that he had gone into a war zone. *Id.* at 123. Ms. Boyer also said that it would be better "to let him just chill, don't force the issues, and that Mr. Brown just needed to work through it." *Id.* Ms. Boyer said that she lived above Brown and that she wasn't "going to go near the doors because he told me to stay away from the doors and I'm going to stay away." *Id.* Finally, Ms. Boyer warned officers that if they entered the townhome with force, they "would be met with force." *Id.*

At 5:04 p.m., officers spoke with Brown's friend, Brian Sheridan. *Id.* Mr. Sheridan said that he received a text message from Brown at 9:00 a.m. in which Brown seemed upset. He said that Brown was a "recluse" who stayed in his basement and was upset with the neighbors. *Id.* at 124. But Mr. Sheridan told the officers that he thought Brown would surrender "in a short period of time" and would speak with officers if some of his friends were present. *Id.* Sheridan said that Brown ended his messages with a text that said "SOUTO," which meant "see you on the other side." *Id.*

Based on this information, officers determined that an arrest would be high-risk and that they needed to use the Tactical Enforcement Unit (TEU), a group similar to a SWAT team, to execute the arrest warrant. The TEU team planned to

7

surround Brown's townhome, contain the area, and call Brown out of the townhome. Because officers knew that Brown had access to firearms and had warned Ms. Boyer to stay away from the doors, the officers were concerned about their safety if they entered the townhome.

### C. Officers Execute the Arrest Warrant

Starting at 6:00 p.m., and continuing about every three minutes, two Colorado Springs Police Department negotiators called and texted Brown's cell phone. At 6:15 p.m., the TEU arrived at Brown's townhome, evacuated the nearby residences, and positioned armored vehicles in the front and back of Brown's townhome. After this, other officers used a bullhorn to order Brown out of the house and to surrender peacefully. Brown didn't respond.

At 7:00 p.m., officers launched tear gas into the main level of the townhome. Around the same time, officers tried removing a metal grate on a basement window well to enable them to release tear gas into the basement. First, officers used an automobile to try to pull the metal grate from its position after hooking a line to the grate. Next, officers detonated two explosions on the metal window grate, succeeding in bending the metal grate and breaking the basement window. The officers then attached a tear-gas can to the end of a pole and tried to maneuver it through the broken window. This effort failed when the pole broke after hitting something inside the basement. That ended the officers' effort to get tear gas into the basement through the window.

8

Trying a new approach, the officers brought two robots to Brown's townhome. At 7:38 p.m., using the larger of the two robots, officers breached the front door and used the robot's camera to confirm that no one was on the main floor. The officers used the robot's speaker to make announcements and ask Brown to surrender. At 8:17 p.m., officers launched more tear gas into the main level of the townhome. At 8:31 p.m., officers used the robot to try to open the door separating the garage and the inside of the home, seeking to see whether Brown's car was in the garage. This attempt failed because the interior door didn't fully open, restricting the robot's camera's view. At 9:32 p.m., using a claw on the same robot, officers made a hole in the garage door from outside the house. Using the robot's camera, officers saw Brown's car in the garage, which together with other information led them to believe that Brown was likely still inside the home.

Next, officers tried guiding the smaller robot into the home's basement to release tear gas there. But that robot was too small to get down the stairs, and the officers lost communication with it when it entered the stairwell area. The officers used the larger robot to retrieve it. Soon after this, the officers saw that the larger robot could not go down the stairs either. So the officers sought help from military personnel at Fort Carson, a nearby military base. Fort Carson had a medium-sized robot that could navigate the stairs. The officers learned that Fort Carson was sending a medium-sized robot.

Sometime that evening, Mary Hankins arrived at the townhome and asked officers if she could speak with Brown. The officers declined this request. Ms.

Hankins also heard a negotiator from Fort Carson, who had experience dealing with persons afflicted with PTSD, ask the officers if he could help negotiate with Brown. According to Ms. Hankins, the officers rejected the negotiator's offer of assistance.

At about 10:15 p.m., officers discussed using an explosive device to blow a hole in the main-level floor to enable the robot's camera to see into the basement. Officers visited a nearby townhome that had the same floor plan as Brown's. Ms. Boyer confirmed that the neighbor's townhome was the same layout and also told police that she thought Brown would have barricaded himself in the basement's stairwell-storage area, toward the back of the townhome, because that is where Brown stored his weapons, ammunition, food, survival gear, and gas masks.

Rather than continuing to wait for the Fort Carson robot to arrive, officers decided to use an explosive device to blow a hole in the main-level floor.[5] The officers used a 16-by-16-inch frame that was designed to create a hole that size in the main floor to enable a camera to view the basement. At 11:55 p.m., officers detonated the explosive device three feet inside the front door. The explosion created

-------

[5] The record is unclear exactly how much time passed between calling Fort Carson and detonating the explosive device. One officer testified that it had been "quite a lot of time." Appellant's App. at 171. We know the officers called Fort Carson sometime after 9:32 p.m., when the officers used the larger robot to make a hole in the garage door. Officers used the explosive device at 11:55 p.m. So, at most, officers waited two hours and twenty-three minutes. Officers chose to use the explosive device because they didn't know the Fort Carson robot's capabilities and were focused on getting "gas and eyes" in the basement. *Id.* at 135. Further, officers were unsure whether the Fort Carson robot would be able to open the basement door because they thought Brown had barricaded it.

the expected hole in the main floor and a four-to-five-foot hole in the basement ceiling.

Still hesitant about entering the townhome, officers sent a robot to view the basement through the hole in the floor. Officers saw Brown lying on a bed beneath the explosion. Debris from the blast had landed on him, severely injuring him. When police finally reached Brown, they saw that he was wearing a helmet, a gas mask, a Kevlar vest, and ear plugs.

## II.    Procedural Background

Later, Brown pleaded guilty to two counts arising from the standoff: (1) misdemeanor Failure or Refusal to Leave Premises or Property upon Request of a Police Officer, in violation of Colo. Rev. Stat. §§ 18-9-119(2), (4); and (2) felony Menacing, in violation of Colo. Rev. Stat. § 18-3-206.

Brown sued Colorado Springs and the officers involved in executing the warrant. In his Amended Complaint, Brown asserted claims under 42 U.S.C. § 1983 against ten officers in their individual capacities for injuries caused by their use of excessive force in violation of the Fourth Amendment. In addition, Brown asserted a failure-to-train claim against Colorado Springs, its police chief, a deputy chief, and two commanders, in their official capacities. In response, Defendants filed a summary-judgment motion, arguing that the officers sued in their individual capacities were entitled to qualified immunity and that the district court should grant

11

summary judgment on Brown's municipal-liability claim against Colorado Springs and the officials in their official capacity.[6]

Concluding that Brown had provided sufficient facts to establish that officers had violated a clearly established Fourth Amendment right by using excessive force, the district court denied Defendants' request for qualified immunity. In discussing whether the officers violated a clearly established Fourth Amendment right, the district court acknowledged that "there is no precedent for the claims in this case." Appellant's App. at 239. Without citing any cases that it believed showed a violation of a clearly established Fourth Amendment right with regard to the specific facts of this case, it concluded that "[o]fficers can still be held on notice that their conduct violates the Constitution even in novel factual circumstances." *Id.*

In addition, the district court found sufficient evidence from which a jury could find that the City and the official-capacity Defendants had a policy of inadequately training its officers. Thus, it also denied Defendants' summary-judgment motion on the municipal-liability claim against Colorado Springs and the official-capacity claim against the named police officers. Defendants appealed.

---

[6] Brown also filed a partial summary-judgment motion, arguing that he was entitled to judgment as a matter of law. The district court denied Brown's summary-judgment motion.

12

**DISCUSSION**

## I. Standard of Review

We review de novo a grant of summary judgment based on qualified immunity. *Puller v. Baca*, 781 F.3d 1190, 1196 (10th Cir. 2015). "[Q]ualified immunity . . . is both a defense to liability and a limited 'entitlement not to stand trial or face the other burdens of litigation.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Once a defendant asserts qualified immunity, "the burden shifts to the plaintiff to establish (1) a violation of a constitutional right (2) that was clearly established" at the time of the violation. *Puller*, 781 F.3d at 1196. We may decide which of these two prongs to address first, and need not address both. *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 n.2 (10th Cir. 2009) (citing *Pearson*, 555 U.S. at 236).

To meet the "heavy two-part burden" necessary to overcome a qualified-immunity defense, plaintiffs must point to admissible evidence in the record. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). "We review the evidence in the light most favorable to the nonmoving party." *Puller*, 781 F.3d at 1196 (quoting *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (en banc)). But we need not make unreasonable inferences that are unsupported by the record. *See Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1187 (10th Cir. 2013) ("Although our summary judgment standard requires us to view the facts in the light most favorable to the non-moving party, it does not require us to make unreasonable inferences in favor of the non-moving party." (quoting *Carney v. City & Cty. of Denver*, 534 F.3d 1269, 1276

(10th Cir. 2008))). On appeal, we have jurisdiction to review "(1) whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation, or (2) whether that law was clearly established at the time of the alleged violation." *Cox v. Glanz*, 800 F.3d 1231, 1242 (10th Cir. 2015) (quoting *Roosevelt-Hennix v. Prickett*, 717 F.3d 751, 753 (10th Cir. 2013)).

## II.     Qualified Immunity

"Qualified immunity protects governmental officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Schwartz v. Booker*, 702 F.3d 573, 579 (10th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood'" the contours of the right. *Mullenix*, 136 S. Ct. at 308 (quoting *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012)). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "[I]mmunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Pauly*, 137 S. Ct. at 551 (quoting *Mullenix*, 136 S. Ct. at 308).

The Supreme Court has directed us "not to define clearly established law at a high level of generality." *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 742). Instead, we must ask "whether the violative nature of *particular* conduct is clearly established." *Id.* (quoting *al-Kidd*, 563 U.S. at 742). And we must do so "in

14

light of the specific context of the case, not as a broad general proposition." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

We decide this appeal based on the clearly-established-law prong, and do not decide whether the officers violated Brown's constitutional rights. In *White v. Pauly*, the Supreme Court repeated its rule against defining clearly established law for excessive force under a too-general standard. 137 S. Ct. at 552. The Court said that "[i]n the last five years, this Court has issued a number of opinions reversing federal courts in qualified immunity cases," recognizing that "qualified immunity is important 'to society as a whole,' . . . and because as 'an immunity from suit,' qualified immunity 'is effectively lost if a case is erroneously permitted to go to trial.'" *Id.* at 551 (quoting *Pearson*, 555 U.S. at 231). The Court concluded that our circuit had erred by failing "to identify a case where an officer acting under similar circumstances as [the officer-defendant] was held to have violated the Fourth Amendment." *Id.* at 552. The Court faulted our reliance "on *Graham* [*v. Connor*, 490 U.S. 386 (1989)], [*Tennessee v.*] *Garner*, [471 U.S. 1 (1985)] and [our] Court of Appeals progeny, which . . . lay out excessive-force principles at only a general level." *Id.* The Court reemphasized its previous holdings declaring that "*Garner* and *Graham* do not by themselves create clearly established law outside 'an obvious case.'" *Id.* (quoting *Brosseau*, 543 U.S. at 199).

Brown asks us to do exactly what the Supreme Court has told us not to do— define clearly established law based on *Graham* and *Garner*. *See* Appellee's Br. at 50 ("When a suspect does not pose an imminent threat . . . *Graham* and *Garner* and this

15

Court's progeny . . . [are] clear that the use of deadly force is unreasonable."); *id.* at 53 ("The officers' actions in this case are unreasonable and thereby violate *Graham*."); *id.* at 24–25 ("Although there is no precedent for the officers' actions, the officers [sic] conduct was so egregious that a reasonable officer would have been aware that their conduct violated *Graham* . . . and *Garner*."). The Supreme Court rejected this same argument in *Pauly*, declaring that "*Garner* and *Graham* do not by themselves create clearly established law." *Pauly*, 137 S. Ct. at 552.

The district court properly recognized that "there is no precedent for the claims in this case." Appellant's App. at 239. In the Supreme Court's words, "[t]his alone should have been an important indication" that officers didn't violate a clearly established Fourth Amendment right. *Pauly*, 137 S. Ct. at 552. Just as the plaintiff in *Pauly* had failed to show that an "officer acting under similar circumstances as [the officer-defendant] was held to have violated the Fourth Amendment," Brown has failed to cite a case holding that an officer acting under similar circumstances as presented here had violated the Fourth Amendment. *Id.* Instead, Brown relies on cautionary language from flashbang cases to show that the officers in this case violated a clearly established Fourth Amendment right when they detonated an explosive device while executing an arrest warrant. For a variety of reasons, we are unpersuaded that those cases provide Brown much help.

Brown's cited cases don't clearly establish that the officers' use of the explosive device violated Brown's Fourth Amendment rights. For instance, Brown cites *Kirk v. Watkins*, 182 F.3d 932, 1999 WL 381119 (10th Cir. 1999) (unpublished

16

table decision). In *Kirk*, officers used two flashbangs when executing a no-knock warrant on a potentially dangerous suspect. *Id.* at *1. Officers thought they knew the layout of the bedroom based on their earlier presence in the house. *Id.* But, unknown to the officers, the Kirks had moved their bed to a spot beneath the window. *Id.* at *2. So when the officers threw a flashbang through the bedroom window, it landed on the bed, started a fire, and burned the Kirks, who were lying on the bed. *Id.* Kirk argued that the officers had used excessive force in using the flashbang and by blindly throwing the flashbang through the window. *Id.* at *4.

We held that "the use of a flashbang device in this case did not, in and of itself, constitute a violation of the Kirks' Fourth Amendment rights." *Id.* Next, we addressed the Kirks' claim that officers had violated the Fourth Amendment by blindly throwing the flashbang through the window. We didn't decide whether blindly throwing the flashbang through the window had violated the Kirks' Fourth Amendment rights. Instead, we addressed the second prong of the qualified-immunity analysis—whether officers violated the Kirks' clearly established Fourth Amendment rights. *Id.* We concluded that "[e]ven assuming that a constitutional violation was shown," any violation wasn't clearly established. *Id.* So contrary to Brown's arguments, *Kirk* doesn't clearly establish that the use of flashbangs violates the Fourth Amendment, and certainly doesn't clearly establish that the use of a different explosive device under the much different facts of this case violated Brown's Fourth Amendment rights.

17

Next, Brown cites *United States v. Myers*, 106 F.3d 936 (10th Cir. 1997), as support for his argument that our circuit "has long recognized individuals' rights to be free from the unreasonable use of 'flash-bangs.'" Appellee's Br. at 44. This argument is similarly unavailing. In *Myers*, a criminal defendant sought to suppress evidence of a marijuana-grow operation based on the officers' alleged use of excessive force. 106 F.3d at 940. Officers burst into the Myers' home and immediately rolled a flashbang into the living room. *Id.* Myers, his wife, his nineteen-year-old stepson, his nine-year-old stepdaughter, and his seventeen-month-old daughter were all in the house. *Id.* at 939. In considering whether the officers had used excessive force, we noted that the "use of a 'flashbang' device in a house where innocent and unsuspecting children sleep gives us great pause." *Id.* at 940. Despite our concern, we held that "[a]lthough it might seem that the [officers'] actions in this case come dangerously close to a Fourth Amendment violation, we cannot say that their actions were objectively unreasonable." *Id.*

So *Myers* doesn't clearly establish that even using flashbangs under similar facts to Brown's would violate the Fourth Amendment. And further, in *Myers*, our concern focused on using a flashbang "where innocent and unsuspecting children sleep." *Id.* Here, the officers knew that Brown was alone in his townhome and knew that no innocent and unsuspecting children were in the townhome. Thus, *Myers* doesn't establish that the officers in this case violated Brown's clearly established Fourth Amendment rights.

To show a violation of a clearly established Fourth Amendment right, Brown must show "a Supreme Court or Tenth Circuit decision on point, or that the 'clearly established weight of authority from other courts [has] found the law to be as the plaintiff maintains.'" *Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017) (brackets in original) (quoting *Klen v. City of Loveland*, 661 F.3d 498, 511 (10th Cir. 2011)). Brown cannot show any Supreme Court or Tenth Circuit decision on point or that the clearly established weight of authority from other circuits prohibited the officers' conduct in this case.[7] Thus, we must reverse the district court's denial of qualified immunity to the Defendants on Brown's individual-capacity claims.[8]

## III. Pendent Appellate Jurisdiction

Next, Defendants challenge the district court's denial of summary judgment on Brown's municipal-liability claim against Colorado Springs, and the official-capacity

---

[7] None of Brown's cases from other jurisdictions provide clearly established law prohibiting the officers' use of the explosives. *See, e.g.*, *Boyd v. Benton Cty.*, 374 F.3d 773, 781 (9th Cir. 2004) (using a flashbang in a room where eight people who were unconnected to the suspect were sleeping violated the plaintiffs' constitutional rights but the violation was not clearly established).

[8] No one contends that the officers believed that Brown would be under the blast and thus subject to its force and debris. In his brief, Brown mentions that "prior to the use of deadly force, the officer must, if feasible, provide the suspect with some warning." Appellee's Br. at 29 (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). But we see no clearly established law requiring a warning in the particular circumstances of this case. Here, unlike situations in which police fire guns at suspects, a warning here could have been counterproductive. The police had reasonable, objective bases to believe Brown was in the back of the basement away from the explosion. Had the police warned Brown about their plan to detonate an explosive inside the front doorway, he might have left the back of the basement to try to intercept or disable the explosive device. We have no clearly established law from the Supreme Court or this circuit requiring a warning in that situation.

19

claim against the named police officers. Before addressing the merits of this claim, we must determine whether we have jurisdiction to exercise our discretion to consider Brown's pendent appellate claims. *See Cox*, 800 F.3d at 1255 (before reaching the merits of an interlocutory appeal, we must address our jurisdiction).

We face this question because generally, denial of summary judgment is not a final, appealable decision under 28 U.S.C. § 1291. *Id.* at 1242. But individuals may appeal the denial of summary judgment on qualified-immunity grounds (if they are entitled to raise the defense of qualified immunity), so we have jurisdiction to review the denial of summary judgment against individual officers. *Mitchell*, 472 U.S. at 530. Cities, on the other hand, aren't entitled to qualified immunity, so we normally can't review a district court's interlocutory denial of summary judgment for claims brought against them. *Cox*, 800 F.3d at 1255.

But the pendent-jurisdiction doctrine provides an exception from this general rule, and permits us to "exercise jurisdiction over an otherwise nonfinal and nonappealable lower court decision that overlaps with an appealable decision." *Moore v. City of Wynnewood*, 57 F.3d 924, 929 (10th Cir. 1995). Otherwise stated, we may exercise our pendent appellate jurisdiction only where "a pendent claim was 'inextricably intertwined' with the district court's decision on a non-pendent claim." *Cox*, 800 F.3d at 1255 (quoting *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1148 (10th Cir. 2011)). Whether a claim is inextricably intertwined often depends on whether we address the constitutional-violation prong of the qualified-immunity analysis. In cases where we do not do so—instead electing to resolve a claim under

20

the clearly-established-law prong—we have repeatedly declined to exercise pendent appellate jurisdiction over municipal-liability and official-capacity claims. *See, e.g.*, *Swanson v. Town of Mountain View*, 577 F.3d 1196 (10th Cir. 2009) (declining to exercise pendent appellate jurisdiction over municipal-liability claims after determining that officers were entitled to qualified immunity); *Cox*, 800 F.3d at 1256 (declining to exercise pendent appellate jurisdiction over official-capacity claims after resolving individual-capacity claims on the clearly-established-law prong of qualified immunity).

In contrast, when we have resolved the constitutional-violation prong of the qualified-immunity analysis, we have found interrelated claims. For example, in *Moore*, we addressed the constitutional-violation prong and concluded that Moore had failed to show that his First Amendment rights were violated. 57 F.3d at 927, 931. We determined that Moore's appeals were interrelated "because Moore's federal and state law claims against the City—to the extent the state law claim references the alleged constitutional violation—are both premised on his claim that Defendants violated his First Amendment rights." *Id.* at 930. Because we held that no First Amendment violation occurred, we could find "no basis for holding the City liable under § 1983." *Id.* at 931, 935.

Even when we have jurisdiction to consider pendent appellate claims, doing so is generally disfavored. *Id.* at 1255. And "when we resolve an individual-capacity § 1983 claim on the clearly-established-law prong of qualified immunity, our analysis often . . . does *not* turn on issues inextricably intertwined with those

21

implicated by an official-capacity claim arising out of the same facts." *Id.* at 1256.

Because we decided this case based solely on clearly established law, the claims here are not inextricably intertwined and we lack pendent appellate jurisdiction to consider the municipal-liability claims against Colorado Springs or the official-capacity claims against the named defendants.

## CONCLUSION

For these reasons, we reverse the district court's denial of summary judgment to the officers on Brown's individual-capacity claim and remand with instructions to enter judgment in favor of the officers on this claim (that is, to grant them qualified immunity). We dismiss the portion of the appeal related to Brown's municipal-liability and official-capacity claims for lack of appellate jurisdiction and remand for further proceedings consistent with this opinion.

Entered for the Court

Gregory A. Phillips
Circuit Judge

22